Case No. 15-1238L, NCR Corporation Petitioner v. National Labor Relations Board Mr. Bloom for the petitioner, Mr. DeCant for the respondent Good morning. Good morning. May it please the Court, I'm Howard Bloom. I'm appearing on behalf of the petitioner, NCR Corporation. It is a fundamental National Labor Relations Board policy to afford employees the broadest possible participation in NLRB elections. Do you have the notice in front of you there? The notice of election? I have it in the... Why don't you get it out? Okay. I have a question about it. Do you have it? It's in the appendix. Here, I'll just read it to you. Okay. Notice must... Notice. Voters must return their mail ballots so that they will be received in the Region 1 office by close of business Monday, August 1. The mail ballots... Next sentence. The mail ballots will be counted in the Region Office at 10 a.m. of August 5. What's confusing about that? Well, we would contend that by the inclusion of the verbiage, so that they will be received, that the notice language led the employees to believe... What about the next sentence? About the... The next sentence. Well, I think that... What could be clear? I mean, what could be... What's confusing about that? The next sentence doesn't really add anything to the equation because employees reading that first sentence, believing that as it led them to believe that if they put their ballots in the mail in time to be received by August 4, that their ballots would also be there in time to be counted by August 5. That's your case. That's it, right? Well, that's not the entire case. No, but that's your argument. So what's missing, according to you, is a sentence which says... I take it, in your view, what's missing is a sentence which says ballots not received by 10 a.m. will not be counted. Right? That's what's missing. Is that right? Well, I think a sentence... That would be one way, Your Honor, or that ballots must be... Ballots... Yes, ballots that are not there by August 5 at 10 a.m. will not be counted. Now, you agree, I take it, that we review the Board's decision about this notice for abuse of discretion, correct? Correct. We're not reviewing it de novo. Correct. So how do you make an argument that the Board abused its discretion by concluding that this was not unclear? Well, we are arguing that the Board's case law on disenfranchisement, the Garda case and the Wolverine Dispatch case, are implicated by the facts here, and that the Board, throughout this entire process, despite the fact that we have pressed this issue over and over again, the Board has not so much as even mentioned Garda or Wolverine until the Board's brief in a footnote. And we contend that those cases are applicable and that the Board had a responsibility to discuss those cases and to say whether or not they are applicable. What were the facts of Wolverine? Your Honor... Here, I'll help you out. The employees there were deprived of an opportunity to vote because the voting booths were closed at a time when they were supposed to be open. So in that case, they were actually deprived of a right to vote. But, Your Honor, I understand that in a lot of the cases that have been before the Board, Garda, Wolverine, involved that. But the Board has never said that an election irregularity under their two-part test has to include the early closing of the polls. And, in fact, in a situation like this, where the ballots were in the mail, where employees mailed their ballots pursuant to their understanding of the instruction, you could actually analogize and say that the Board closed the polls early here. But the fact of the matter is that those cases do not say this is the only situation where these cases apply. And the Board, in any event, did not say that. They never, in any of their decision-making throughout this case, so much as mentioned Garda or mentioned Wolverine. Okay, if we thought that that defect was not fatal because of the proposition that many of our cases say that although an agency has to explain away its precedent, it doesn't really have to do that if the case is obviously distinguishable. If I thought that that applied, then is there anything left of your case? Does your whole case turn on that, in other words? Our whole case does not turn on that. In this case, we believe the Board abused its discretion in a couple of other ways, Your Honor. Well, at least one other way besides not paying any attention whatsoever, not explaining itself with respect to Garda. We believe that the Board's decision here was arbitrary and capricious because of the Board's failure to follow its decision in MCS Consultants. Now, in that case, that case is almost on all fours with this case. And yet, in that case, the Board decided to count mail ballots that came in after the ballot count. And in this case, they did not. And the only explanation that the Board gives, and this case was cited in the Classic Valet case in a footnote, the Board does say that that case is an unreported case. But agencies are required to act consistently. But they also say there's no evidence here that the Board had any responsibility for what happened. On the one hand, you complain that the Board hasn't addressed Garda, whatever that case is, and the other case. But here, the Board directly addressed this case, and it said it's inconsistent with the Board precedent. In the footnote you're talking about, in the Classic Parking footnote, it says that the case you're relying on wasn't, quote, consistent with the Board's established rule regarding mail ballots. So it did consider it, and it said it's wrong. Well, it didn't overrule it, and it did, in fact, make that decision in that case, which was inconsistent. But we do also have another argument in response to the question that you asked here. The Board set a 14-day period here for the ballots to go out from the region, to arrive at the voters' homes, and then to get back to the region. I think it was July 20 to August for a 14-day period. Yet, the Board itself, in its internal procedures, believes that it could take up to seven days for the ballots to arrive after they are mailed by the Board, and logically, another seven days, perhaps, to get back to the voter. So, in essence, what the Board is doing, and the Board has the responsibility to establish proper procedures for its voting, what the Board is doing here is establishing a procedure that essentially has built-in disenfranchisement. Because if, in fact, under the Board's view, a ballot takes seven days to get to a voter and seven days to get back, if a voter is at work on the day that that ballot arrives at that voter's home, or if that voter decides, I want to take a day or two or three to consider my vote, under the Board's own view, that voter could be disenfranchised. Their vote could come in after the ballots are counted, and we contend that the Board abused its discretion and violated its requirement to set up proper procedures for voting. You dismissed the Board's suggestion in its brief that you could have set up a buffer, period. Your response is that it's the Board's responsibility to set up, to have proper procedures. Didn't the company agree to this procedure? You agreed to it. It was proposed, and your client signed off on this. That is correct. We did agree to it. We proposed different language. But you agreed to this notice and to the procedure. Well, we agreed to the notice after the Regional Director rejected the language that we suggested be in there. And the fact of the matter is that under Board procedure, you don't really have any significant way of challenging when the Board says this is what the language is going to be. The Regional Director said the language is standard language. I don't even see the difference between your proposed one and the Board's one. I mean, yeah, the language is different, but yours says to be valid, the ballot must be received in the Regional Office by the close of business on Monday. How is that materially different? We believe that the addition of the phraseology in the Board's language so that it will be received in the English language, that points out a purpose as opposed to a mandate. And so that language, as a result, said to employees that if they did not get their ballot, that they needed to get their ballot in the mail so that it would be received, not so that it must be received. So we do think that there is a difference between the language that we suggested and the language that the Board required us to have in the language. The Board has the right, the Regional Director is given an awful lot of discretion to set the terms of an election. And like I said, there really isn't much that an employer or a union can do to challenge that. So yes. File some objections. Which is what? And preserve the issue. Well, we... Let me say, this is not the only scheme where regulations call for an individual to return something by a certain date. And even though the person said, in good faith, I was relying on the Postal Service to get it there in five days, it's not good. I've always had trouble with these proposals, but they've been upheld. Trouble in the sense of fairness. But here, where you agreed to use this mail-in procedure, and you did have a chance to suggest other language, and the Board says you could have asked for this buffer, at least in its brief. Well, Your Honor, it had been my experience with the Board in previous mail ballot elections that, and we've seen they want to get these over with very quickly. So we could have asked for a buffer. You're correct. But we would not have been given the buffer. And again, the bottom line is, it's the Board's responsibility to make sure these elections are held properly. And here, knowing about this 14-day period, there's a built-in possibility of disenfranchisement, and there's a real concern here about whether or not the result here is the will of the majority because of this improper procedure that the Board employed here. All right. Let us hear from the Board. Thank you. May it please the Court? I'm Kyle DeCant on behalf of the National Labor Relations Board. The Board acted within its broad discretion in overruling the company's objection that it should count seven late ballots that were received only after the official election accounts. Does the Board, do you know what those seven ballots show? Would they have changed the election? Under the election as it currently stands, we're... Yes or no? Did the Board open them? Do we know that there was a majority of votes, enough votes to have changed the results of the election? The ballots haven't been counted, Your Honor. Well... They've been opened. Is there a reason why? No, they haven't been opened, Your Honor. Suppose they were all for the union. We wouldn't be here today, right? That's correct, Your Honor. Well, is there something I'm missing about, is there some sort of policy reason why the Board doesn't open them to decide whether this is all even worth it? Your Honor, the Board has decided to weigh the need for employee choice with the need for finality. No, that's not my question. My question is that, okay, so they say, well, you should have, the Board should have counted these seven ballots, right? My only question is, why not open them up and find out if they would have been outcome determinative? If they wouldn't have been outcome determinative, then the Board wouldn't have had to waste its time, the employer wouldn't have had to waste its time and spend more money on its capable lawyer to bring this case, and we wouldn't have had to address this case. So my question is, is there something about Board policy that makes it unwise to open those ballots? That's my only question. Yes, Your Honor, there is something unwise about it. What is it? And that is that those ballots could change the election after 76% of the ballots in this case had already come in before the count. And that could possibly change the election after the Board begins bargaining or after objections have already been filed. And the Board here has decided to weigh the need for employee choice with the need for finality of elections. You don't want to answer my question, do you? It's all right. Well, I thought one answer was that the way the Board has set these elections up, you can have bargaining start immediately. That wasn't my question. I know it wasn't, but they're saying that that would be a reason for almost... It's a slippery slope. Yeah. If you adopt this approach, it might be ballots that come in a week later. No, no, that wasn't my question. It goes on and on and on. If it says it's a cut, we're done. I wasn't asking that question. All right, let Judge Taylor ask his question again. I wasn't arguing with you about the Board's policy. I totally understand the Board's policy, that you need finality. You could probably tell from my questions to the petitioner that I don't see how this could be an abuse of discretion. In fact, I don't even see anything unclear about the notice. My only question is, if we knew that those seven ballots wouldn't change the election, we wouldn't have to go through all this. Just those seven ballots. Suppose they were all for the union. Then the employer wouldn't have to waste his time bringing this case, and the Board wouldn't have to waste its time deciding it, and we wouldn't have to spend our time hearing it. That's my only question. Well, if they were all for the employer, would bargaining proceed the way the Board anticipates? Well, then we'd have to hear the case to decide whether the Board had improperly refused to... I'd like to know what your answer, though, is to the concern about setting up an election that, or approving an election procedure where the Board itself acknowledges that mail receipt takes seven days, and even has in its notice that if you didn't get the ballot by a certain date, call us. That's true, Your Honor, but here the terms of the election agreement were actually established by the parties. No, no, no. Totally true. And suppose they came up with something ridiculous. The Board wouldn't be, or the regional director wouldn't be obligated to adopt it. All right? That's the point. If you set up an impossible system by approving what the parties have proposed, isn't that troubling? Your Honor, in the email correspondence between the Board region and the company on this matter, the Board actually noticed this discrepancy and offered to set out the original correct notice of election to employees. And in that case, the company didn't take the Board up on its offer. And so as such, the dates that the parties had agreed to had stayed in place. And under the terms of the agreement, they could have bargained to have it count two or three days later than the date by which the ballots were due, but the company chose not to do so. Let me pursue Judge Rogers' question just a little bit, just as an abstract matter. Wouldn't it make more sense for the Board to have a policy saying it all turns on postmark date? Wouldn't that be the best way to ensure the integrity of the election and make sure everybody gets to vote? No, Your Honor. Under that proposal by the company, the Board's decided in its broad discretion that allowing a proposal like that could allow ballots to change the result of an election weeks or even months after the election has been. You mean because a postmarked ballot might come in three months later? Yes. And as such, the parties could. Has that happened? I mean, I don't know. I mean, I don't know that that happens. Has the Board set up any sort of e-mail system or electronic voting? Your Honor, I believe that— You would get hacked by someone. You wouldn't want to do that. The Russians would hack it, and then where would we be, right? If I'm correct, there's actually a waiver that prohibits the Board from doing that, but I'm not entirely confident on that point. All right. But here, the Board's decision is a very clear application of classic valet, and in that case, the Board held that 10 ballots that were received after the count would not be counted, even though they were postmarked before the date of the count. And the Board there cited precedent that stated that ballots could be counted if they arrived after the due date, as long as they did not arrive after the count. So if you're an employee and you want to be sure the Board gets your ballot and it's a mail-in, can you just hand-carry it to the regional office? I think that would depend on the terms of the notice of election. Well, this notice. This notice. Your Honor, I'm honestly not sure. That would depend on the agreement of the parties. Well, what I'm looking at is voters must return their mail ballots so that they will be received in the regional O1 office by close of business Monday. So I read that to mean that, well, if you hired somebody to hand-deliver this, you'd be sure. But that's not what the Board is contemplating by the mail-in system. That may be one interpretation, but the regional director did not reach that issue in their report on the objections. So what's the theory behind mail-in, where you have this uncertainty that's out of the control of either the Board or the employee voting? The Board decided that a mail-in system is the best way that, in this case, employees who don't have a single work site but are spread across multiple areas can get their votes in on time. And courts have upheld the Board's finding that mere vagaries in the mail-in ballot system aren't enough to overturn an election when the voice of the employees is heard. Absent, a blizzard, or something else like that. And certainly there may be situations like that. Well, here they extended it until 11 a.m. because the mail hadn't arrived by 10. And, Your Honor, that was according to what the parties had agreed to that morning. And so against the very clear precedent that the Board has cited, the company cites only one case, MCS Consulting, as the single case where the Board has decided to count ballots that were received after the count. So is it fair to take the Board at its word that it views mail-in requiring you to put your ballot in the mail at least seven days before the date it's due to be received? By the Board or by the employee, Your Honor? I'm not sure if I follow. If the Board's procedure is based on the premise that it takes seven days for a ballot to be received by an employee when it's mailed by the region, then is the Board in any way stopped? The Board's policy wasn't to give it seven days, but to allow seven days in the event that an employee had not yet received their ballot. And here that compressed schedule was determined by the schedule that the parties had agreed to, setting up for the ballots to be returned by August 4th and counted on August 5th. But you must admit that the timing here, except for one of the ballots, is troubling. I mean, the ballot that was mailed the day before. But other ballots were mailed, what, five days in advance? That might have been the case, Your Honor, but here over 75% of the ballots were received on time. And that's good enough? Well, even in Antelope Valley, this court found that it's unreasonable to question whether all employees were franchised enough to overturn an election, and there only 66% of the ballots came in on time. Here, over 75% of the ballots came on time. And so that's exactly why MCS isn't consistent with the Board's normal practice, where while the Board said that it would allow those late ballots to be applied in light of the unique circumstances of that case, it didn't specify what those unique circumstances were. However, the case is certainly exceptional in the fact that there, only 33% of the ballots arrived before the date of the count, and the majority arrived after the count, which is the reason why that case wasn't reported, because the Board had decided that its normal policy wouldn't simply be equitable in a situation where only 33% had their votes heard before the date of the count. What's the cutoff? The Board hasn't specified that, Your Honor, yet, and there may be a case in the future where the Board has determined to. But this case involved a very straightforward application of the normal precedent, which would be that you allow ballots before the count, but not after. One of the arguments that Petitioner makes in his brief is that the Board failed to consider what it calls its line of disenfranchisement cases, like Garda and Wolverine. Did you respond to that in your brief? Yes, Your Honor. We noted that those cases involved where there's an irregularity at the polls. So in Garda, there was an irregularity where the voting session closed before the agreed-upon time, and in Wolverine Dispatch, there was a mid-session closing of the polls that the parties had not agreed to. And here, there is no irregularity because the election proceeded exactly according to the terms of the stipulated agreement and the notice of election. And so under that circumstance, the company's only argument, therefore, seems to be its misreading of the notice of election to which it had agreed and the stipulated agreement to which it had also signed. However, this language reasonably communicates that voters must mail their ballots so that they will be received by August 4th. Being received by August 4th is something that must happen, and the following sentence clears up any ambiguity when it states that the ballots will be counted on August 5th. The company's proposal would be that a ballot that comes in weeks or even months after the election could somehow upturn the whole collective bargaining process, and the board, in its discretion, has decided to properly balance the need for employee choice with the need to have finality in elections in order to preserve that. Okay. Anything further? No. Thank you. Thank you, Your Honor. The board respectfully requests that the court enforce the board's order. Counsel for petition? The board, just to address some of the points that were raised, mail ballots must be mailed to the board. They cannot be hand-delivered. I suppose if there was language in the stipulation, I've never seen it, but it's a mail ballot election. In our case, seven ballots arrived two days after the vote count, so I think six. All seven? All seven did, yes. The one that you may be referring to is the one that was mailed from Boston on August 4th, but there were five ballots that were mailed from 50 miles away that came in that were mailed five days in advance, and then another ballot that was mailed from 25 miles away four days in advance. But we're not talking about ballots coming in months and years, et cetera, afterwards. We're talking about ballots that came in two days after the vote count. And it's interesting to note that the board, in connection with its objections procedures, has done something that very simply could have been applied to its mail ballot procedure, which is look at the postmark on the ballots and add a hard cutoff with objections, which keep an election going on and on and interfere with the finality of the election. Of course, how do we, given our standard of review, even if we think you might be right about that, how do we reverse the board on that, given that this is highly discretionary? I mean, the case law is really clear that running elections is something we defer completely to the board on. So how do we do that, even if I agree with you? Because, I mean, your point is pretty well taken. Yes, Your Honor, and I'm not suggesting that the court issue an order that, from here on in, the board use a postmark rule. But I think the fact that they have come to the conclusion, with respect to objections, that they look at the postmark on the objections and the fact that they will accept objections, no matter when they come in, as a document that can upend and keep an election from being final, in conjunction with this seven-day situation that they have acknowledged on page 32 of 39 of the board's brief and their addendum to their brief, anything less than a week doesn't give the Postal Service a full chance to deliver the ballot. So, indeed, and I know this individual at the board who wrote this, he's been there a long time, and that's what that went to, not the issue of having people, you know, contact them. The grovelment of that is that they're admitting that an election that they've set up here is almost certain to disenfranchise voters, and that runs counter to the board's requirement that they establish proper procedures for the holding of an election. I just want to ask you the same question I asked the board counsel. Did you ask the board to open these ballots to see if it would have made any difference in the election? We did, Your Honor. You did do that, right? Yes. And what did they say? They said no. I mean, I assume if you had found out it was all votes for the board, for the union, you wouldn't have wasted your time with this, right? That's correct. So what's the reason for the board? Do you do this kind of work regularly? Yes, I do. Does the board never open up the ballots? Is there something I'm missing? You ask, do you always, in cases like this, do counsel for either the company or the union, when you have five or six or ten contested ballots, do you usually say, look, let's open them up and see if they would have been outcome determinative? Well, certainly the board has a challenge procedure. No, I'm not talking about that. Okay. I'm just asking from your point of view. You said you asked them, right? Because I assume you wanted to know whether it would have made a difference. What was the reason they gave for not looking to see that? Well, I mean, your first answer, Judge Taylor, is no, the board does not routinely open up ballots. But why? That's just not their priority. Well, in circumstances like this. The board routinely, outside the context of a challenge, does not open ballots because it would be like Pandora's box opening up. That's the reason. It may be wrong. He challenged these ballots. He said these ballots should be counted. Right? You wanted these seven ballots counted. That's your whole case. Yes. And I assume you said to the board, before we go through all this and spend a lot of money, why don't we find out if they would have been outcome determinative, right? Yes. Wait, wait, wait. You wanted it with the count? Or you made this request after the count? Wait, I'm confused. Yes, after the count. After the count. Right. We found out from the region, actually from Mr. Red Board, that these seven ballots had come in. So I made a request. Because it's not part of the challenge. It's not what we would typically understand. Right? That's correct. Because that would involve ballots that arrived at the time of the count. You would challenge, say, well, that person who voted is a supervisor. Well, that person was no longer employed. So there was nothing in the process that anticipated it. Nothing wrong with you asking, but there was certainly no process that anticipated it. Right? That's correct. But why did you ask? Because we felt that these voters ought to have their votes counted. We have no idea how they voted. If you found out that they were all for the union, what would you have done? Nothing, right? This isn't part of the case. I just don't understand why the board didn't vote. Who is the person who told you that these seven ballots had come in? Robert Red Board. I mean, is that a board employee? Yes, he's the individual. He's the head of elections. The person who's been there forever? Yes. So you probably know him. So he told you. He created the whole problem. Well, he said it's our responsibility to be transparent here. So I'm going to tell you. And he told me what date they were postmarked, et cetera. Okay. All right. We'll take the case under advice. Thank you very much. Thank you.
judges: Rogers, Tatel, Edwards